**BALTIMORE CONTRACTORS, INC., a body corporate, to its own use and to the use of H. J. Defriez and other similarly situated Underwriters at Lloyd's, London**

v.

**CIRCLE FLOOR COMPANY OF WASHINGTON, INC., a body corporate.**

**Civ. No. 18765.**

United States District Court,
D. Maryland.

Oct. 9, 1970.

Paul Walter and Tydings & Rosenberg, Baltimore, Md., for plaintiff.

George T. Tyler and Ober, Grimes & Shriver, Baltimore, Md., for defendant.

THOMSEN, District Judge.

In form, this is an action by Baltimore Contractors, Inc. (BC), the principal contractor on a construction job, against a subcontractor (Circle) for damages resulting from a fire caused by Circle. In substance, it is a controversy between Underwriters at Lloyd's, London (Lloyd's), which had issued to BC a Builder's Risk Policy, insuring against all risks of physical loss or damage to the work in progress, and Liberty Mutual Insurance Co. (Liberty), which had issued to Circle a Comprehensive General Liability Policy.

Counsel for Circle and Liberty contend: (1) that Circle is an insured under the Lloyd's policy; (2) that Lloyd's may not assert a claim by way of subrogation against one of its insureds; (3) that the "other insurance" clause of the Lloyd's policy does not operate as an excess clause; and (4) even if plaintiff is entitled to recover, interest should not be awarded. Counsel for BC and Lloyd's dispute each of those contentions.

The case has been submitted to the Court without a jury on a stipulation and supplemental stipulation of facts, with attached exhibits, and one affidavit. The parties have also agreed that the Court may draw proper inferences from the stipulated facts. Diversity jurisdiction exists.

BC, as general contractor, entered into a contract with the City of Baltimore (City or owner), under which BC undertook to construct and deliver to the City, in complete and acceptable condition in accordance with the plans and specifications, new buildings for Baltimore Polytechnic Institute and Western High School.

BC entered into two subcontracts with Circle, each dated November 26, 1965, under which Circle undertook to perform certain work, viz: "Provide all the required labor, materials, tools, equipment, scaffolding, facilities and service, necessary for and incidental to the performing of all Work called for in" specified divisions of the prime contract, including "Resilient Flooring" and related work, in strict conformity with the prime contract between BC and the City.

The prime contract contained customary provisions that BC would be responsible for any damage which its work and operations might cause to the work being constructed, that BC would be responsible for the acts and omissions of its subcontractors and would indemnify the City against all claims arising out of the operations of BC and its subcontractors, and that BC would carry specified amounts of Compensation, Liability and Property Damage Insurance. The prime contract also contained the following provision:

"46. *Insurance (Fire, etc.):*

"(a) The Contractor shall at his own costs, insure the work and keep it insured at all times during the peri-

od of construction and until final acceptance of it by the City, against loss or damage by fire, storm, wind, and hail, the amount of insurance at all times to be at least equal to the amount paid on account of work and material and plus the value of work or materials furnished or delivered but not yet paid for by the City provided, however, that in fixing the amount of said insurance, from time to time, the value of non-insurable items as determined by the Engineer may be deducted.

"(b) The policies shall be made payable to the City and the Contractor as their interests may appear, and the policies shall be left in the possession of the Engineer."

The subcontracts between BC and Circle included the following provisions:

"V. Subcontractor shall do the work and diligently proceed with same in a thoroughly workmanlike manner under the direction of Contractor and to the satisfaction of Owner and Contractor. With respect to the scope, details, execution and conditions of acceptance of the work, Subcontractor shall be bound by the provisions of the Prime Contract to the full extent that Contractor is bound.

"VI. Prior to completion and final acceptance, the risk of loss or damage to the work from any cause whatsoever caused by Subcontractor shall be upon the Subcontractor, who shall not make any claim or demand or bring any suit or action whatsoever against Contractor and Owner arising out of any such loss or damage to the work but shall promptly and diligently and at his own expense rebuild, repair and restore the work to its condition prior to such injury, loss or damage. Subcontractor shall defend, indemnify and hold Contractor and Owner harmless against and from any claims, suits, actions, or demands, of or by any person (including Subcontractor's employees), firm or corporation for damages for death, personal injury, property damage or other loss or injury arising out of or in any manner connected with the performance of the work by Subcontractor. Contractor may retain as security from any money due or to become due hereunder an amount not in excess of all claims or demands against and from which Subcontractor is required to defend, indemnify and hold it harmless as aforesaid, and Subcontractor agrees to reimburse Contractor for surplus amounts not withheld through deductions.

"Subcontractor shall procure, prior to the commencement of the work and keep in effect during the whole course of the work: (a) comprehensive general liability insurance; * * *."

In accordance with the requirements of the subcontracts, Circle provided BC with an appropriate certificate of insurance from Liberty, indicating that Liberty had issued to Circle a Workmen's Compensation Policy, a Comprehensive General Liability Policy and a Comprehensive Automobile Liability Policy, stating that the General Liability Policy covered "All Hazards, Including Contractual". That policy included a broad "Contractual Liability Insurance Endorsement", and covered both the negligence claim and the contractual claim which are asserted as basis of recovery against Circle herein.

Thereafter Circle began performance of its obligations under the subcontracts, which included the installation of vinyl tile to the floor of the premises under construction. In furtherance of its work, Circle requested and was assigned a room in one of the new buildings for use as a storage room. That room was under the exclusive control of the employees of Circle, which, on January 31, 1967, had stored twenty 5-gallon cans of "Solarite" mastic in the room. At about 8:30 a. m. on January 31, 1967, Circle's superintendent placed a gas-fired flame heater on the floor close to the cans of "Solarite" and ignited the heater, in order to heat the mastic and make it more pliable and easier to apply to the floor surface. The cans bore a la-

bel which contained the following warning in large print:

"CAUTION  SOLARITE
Flammable Mixture MC 1509 Mastic
Do Not Use Near Wood Block Floors
Fire or Flame  Cold
      Solar Compounds
      Corp.
      Linden, N. J."

Circle's superintendent also put a piece of plywood at the rear of the heater, which was facing the cans of mastic, to reflect the heat toward the cans. At about 2:30 p. m. on January 31, the mastic ignited, either from overheating or from a spark from the heater. Placing the lighted heater so close to the cans of mastic was negligent and was the proximate cause of the fire. The mastic burned with a high-intensity heat and much smoke, causing extensive damage to the storage area, to other parts of the building and to fixtures therein.

Liberty and Lloyd's cooperated in the investigation and adjustment of the loss and shared the cost of the investigation and adjustment on a 50–50 basis.

■ The original estimate for repairs was over $180,000. The adjusted figure, agreed upon by BC and Lloyd's, was $77,020.20, including a factor of 15% of cost for supervision of the repair work. Circle and Liberty contend that the sum of $6,809.44, included in the $77,020.20 under the heading "Electricity and Heat", is not properly included in the loss and damages. Based upon the affidavit of W. L. Poe, offered in evidence without objection, the Court finds that the $6,809.44 is a proper item of damage, and that damages sustained by BC as a result of the fire amounted to $77,020.20.

BC received from Lloyd's $52,020.33, the amount of BC's loss, less the $25,000

deductible under the Lloyd's policy, and executed a customary loan receipt agreement. Lloyd's claims, by subrogation to BC's claim against Circle, the right to recover $52,020.33 in this action.

Liberty, as insurer of Circle under its Comprehensive General Liability Policy, paid BC $25,000, without prejudice and with the understanding that it would defend Circle herein and might raise any defense which Circle might have to the claim asserted by BC and Lloyd's.

BC has suffered no uncompensated damages. It has made no claim against Circle for any delay damages as a result of the fire, and the City has made no claim for delay against BC.

1

The Builder's Risk Policy issued by Lloyd's to BC covered all jobs in the United States and Canada, with specified exceptions, for a period of one year. Subject to its limitations, exclusions, terms and conditions, the policy insured "against All Risks of Physical Loss of or Damage to:—

"(a) Property in course of construction, reconstruction or repair whilst at the risk of the Assured and whilst at the location of the said construction, reconstruction or repair operations (all of which are herein referred to as 'The Construction Operations') which are the subject of the contract or contracts described in the Schedule attached hereto and forming part hereof:[1]

"(b) Property of every kind and description (including materials and supplies) owned by the Assured and used or to be used in a part of, or incidental to, the construction operations wherever the said property may be located in Canada, St. Pierre and Miquelon, the United States of Ameri-

---

1. Paragraph 4 of the Policy provided:
 "The property referred to in Paragraph 1(a) shall be deemed at the risk of the Assured during the period of the construction operations and until the said property has been formally accepted by the owner as complete and during such fur-

ther period thereafter as any payment provided for under the Contract entered into between the Owner and the Assured shall remain unpaid by the Owner but only to the extent of the amount so remaining unpaid."

ca (comprising the 50 States of the Union, the District of Columbia and Alaska), and whilst in transit within and between any place or places aforesaid:

"(c) Property of others used or to be used in, a part of, or incidental to the construction operations, for which the Assured may be responsible or shall, prior to any occurrence for which claim may be made hereunder, have assumed responsibility:

"Loss, if any, arising under this Paragraph 1(c) shall be adjusted with and paid to the Assured."

Under the heading "Exclusions" it was provided: "This Policy does not cover:— * * * (n) contractor's equipment of every description".

The name of the Assured was stated to be: "Baltimore Contractors, Inc., Building Owners and/or Sub-contractors As Their Interests May Appear".

This clause was clarified by Paragraph 3 of the policy, which read:

"In respect of operations performed by sub-contractors for the Assured, such sub-contractors may, at the request of the Assured, be included in the name of the Assured but only as regards property of the aforesaid sub-contractors, the value of which shall have been included in the Contract Price shown in the schedule.

"Loss, if any, arising under this Paragraph 3 shall be adjusted with and paid to the Assured."

The Assured, BC, did not request that Circle be included as an Assured in the Lloyd's policy, and Circle did not ask BC to do so. No property of Circle was valued or scheduled for purposes of coverage or the calculation of the premium on the Lloyd's policy. Circle made no claim under the Lloyd's policy after the fire, and no payment was made by Lloyd's with respect to any of Circle's property or work. Moreover, as required by Paragraph VI of the subcontracts, quoted above, Circle carried its own liability insurance, which covered Circle's contractual liability as well as its liability for negligence, and Liberty issued to BC a customary certificate of such insurance.

■ Under Maryland law, Lloyd's policy is to be construed as a whole, and its terms are to be given their normal and customary meaning. Mateer v. Reliance Insurance Co., 247 Md. 643, 233 A.2d 797 (1967); Harleysville Mutual Casualty Co. v. Harris & Brooks, Inc., 248 Md. 148, 235 A.2d 556 (1967); Offutt v. Liberty Mutual Insurance Co., 251 Md. 262, 247 A.2d 272 (1968); Snyder v. Travelers Insurance Co., 251 F.Supp. 76 (D.Md.1966); Indemnity Insurance Co. of North America v. Malisfski, 46 F. Supp. 454 (D.Md.1942), aff'd 135 F.2d 910 (4 Cir. 1942).

■ So construed, it is clear that Circle was not an insured under the Lloyd's policy.

The two cases relied on by Liberty dealt with different policy provisions and facts. In Louisiana Fire Ins. Co. v. Royal Indemnity Co., 38 So.2d 807 (La. App.1949), a builder's risk endorsement had been issued to the general contractor which did not contain any provision dealing with the coverage of subcontractors. The claim filed by the general contractor and paid by its insurer included the damage done to fixtures brought by the plumbing subcontractor to the job but not yet installed and the cost of replacing the subcontractor's helper's tools and jacket damaged in the fire. In a suit by the insurer which had issued the builder's risk endorsement to the general contractor against the insurer which had issued a liability policy to the plumbing subcontractor, the Court held that the subcontractor should be held to be an insured under the builder's risk endorsement by reason of three factors not present in the instant case, namely: (a) the language of the endorsement (different from the language in the policy in the instant case), (b) the customs and practices of the building trade (not proved in the instant case), and (c) the recognition that the subcontractor was an insured by the insurer's paying to the general contractor

and the general contractor paying to the subcontractor the amount of the damage done to the subcontractor's fixtures not yet installed (there was no such payment by Lloyd's or BC in the instant case). The Court further held that under the law of Louisiana an insurance company which has paid a claim and, "taken a subrogation", has no right of action against a co-insured of the subrogor, even though the fire may have been caused by the negligence of the co-insured, provided there is no fraud.

In Allegheny College v. Crump, Inc., 21 Pa.Dist. & Co.R.2d 207 (Penna. 1959), the contract between the college and Crump, the builder, required the college to insure the field house and the materials used in its construction against fire loss and to name Crump and his subcontractors as insured parties. The Court held that said requirement barred the plaintiff college from recovering from Crump damages resulting from a fire loss even though the fire loss was caused by defendant's breach of contract. No such requirement is present in the instant case.

### 2, 3

 The finding and conclusion that Circle was not an insured in the policy issued by Lloyd's to BC makes it unnecessary to decide whether, if Circle were insured by Lloyd's against certain fire losses, that fact would prevent such an action as this under all the facts and circumstances, including the language of the principal contract, the language of the subcontract, and the provisions of the two insurance policies. It also makes it unnecessary to decide whether the "other insurance clause" in Lloyd's policy made it "excess insurance" with respect to the coverage afforded Circle by its insurer, Liberty. As counsel for Liberty notes, the Liberty policy insured against a different risk from that insured by the Lloyd's policy, and therefore was not concurrent or double insurance. This would militate against an argument that Lloyd's policy was "excess insurance", but would cut the other

way on the question whether under the several contracts and facts of this case the parties intended that Liberty should bear the ultimate loss.

### 4

 Applying the principles set out in Robert C. Herd & Co. v. Krawill Machinery Corp., 256 F.2d 946, 952 et seq. (4 Cir. 1958), and the Maryland cases cited therein, the Court concludes that interest should be allowed on the $52,-020.33 for which defendant is liable herein at the rate of 5% per annum from the date on which Lloyd's paid that amount to BC.

Judgment will be entered accordingly.